UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

FILED
DEC 19 2007
CLERK

| | | |
|---|---|---|
| SAMUEL BOSTON, | ) | CIV. 07- 4189 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT, DECLARATION,** |
| | ) | **NOTICE OF PUNITIVE** |
| TIM REISCH, | ) | **DAMAGES and** |
| DOUG WEBER, | ) | **NOTICE OF APPEARANCE** |
| DARYL SYLKHUIS, | ) | |
| MANISH SHETH, | ) | |
| ROBERT STRAYHAN, | ) | |
| ULISES PESCE, | ) | |
| JUSTIN FALON, | ) | |
| CRAIG KLEINSASSER, | ) | |
| JOHN ERPENBACH, | ) | |
| LUTHER HEGLAND, | ) | |
| JOHN DURSO, | ) | |
| DON BAUM, | ) | |
| DONNA REIT, | ) | |
| E.R. REGIER, | ) | |
| ANDY VOSS, | ) | |
| ALAN BREVICK, | ) | |
| DON GILCHRIST, | ) | |
| MANJOT LEAFGREEN, | ) | |
| MARK STYLE, | ) | |
| A JOHN DOE CORPORORATION, | ) | |
| THE STATE OF SOUTH DAKOTA | ) | |
| and | ) | |
| THE SOUTH DAKOTA | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**PRELIMINARY MATTERS**

1.     The Plaintiff makes the following allegations, under declaration, to the best of his knowledge, in good faith, on information and or belief.

## JURISDICTION, VENUE AND PROCEDURAL MATTERS

2.     This is a civil action for damages and injunctive relief to redress the deliberately indifferent mental health and psychiatric care at the South Dakota State Penitentiary ("SDSP") in Sioux Falls South Dakota pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and Title 42 U.S.C. § 1983 ("1983 Action").  It also is civil action for damages and injunctive relief for violations of the Americans With Disabilities Act ("ADA") pursuant to 42 U.S.C. § 12131 *et seq* ("ADA Action").

3.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

4.     Venue lies in the District of South Dakota under 28 U.S.C. § § 1391(a)(1), (a)(2), and 28 U.S.C.A. § 1391(b) in that the claims arose in this judicial district as a result of acts committed by the Defendants within this judicial district.

5.     Pursuant to the Prison Reform Act 1996, 42 U.S.C. § 1997(e) *et seq.,* ("Prison Reform Act"), the Plaintiff has exhausted his administrative appeals inside SDSP and the SDDOC that attempted to resolve the 1983 Action issues contained within this Complaint.

6.     While the Plaintiff has previously filed state and federal *habeas corpus* actions against the State of South Dakota, these lawsuits did not concern the same set of facts alleged herein.  The Plaintiff's *habeas* actions concerned his underlying criminal conviction; this lawsuit concerns his treatment for mental health issues and psychiatric care by the Defendants while incarcerated as well as discrimination against him based on disability.

## PARTIES
### Plaintiff

7.     The Plaintiff ("Plaintiff," "Mr. Boston," or "Sam"), formerly a resident of Custer, South Dakota, is an inmate at the South Dakota State Penitentiary in Sioux Falls, serving a life sentence for felony murder since 2002.  Mr. Boston was previously incarcerated in 2001 at SDSP for driving under the influence.  He suffers from mental illness, which has been diagnosed off and on through much of his adult life, before and after entering SDSP.  He is an honorably discharged veteran of the United States Army.

8.   On information and belief, Mr. Boston also believes he is a "qualified individual with a disability" pursuant to the Americans With Disabilities Act ("ADA), 42 USC § 12131(2) *et seq.*

## Defendants to 42 USC § 1983 Action ("1983 Defendants)

9.   Defendant Tim Reich ("Reich" or "Secretary Reich") is the Secretary of Corrections ("SDDOC") in Pierre, SD who ultimately oversees and supervises the SDSP, approves and or promulgates rules and regulations concerning the operation of the prison, as well as hiring and firing of independent contractors such as Defendant John Doe Corporation, *infra*, that provide mental health and psychiatric services at SDSP to inmates like Mr. Boston.

10.   Defendant Doug Weber ("Weber" or "Warden Weber") administers the SDSP, is ultimately responsible for the treatment of inmates, including mental health and psychiatric services, reviews and supervises independent contractors such as Defendant John Doe Corporation that who provide mental health and psychiatric services, is ultimately responsible for disciplining inmates, and supervises other officers and staff who work at SDSP.

11.   Defendant Daryl Sylkhuis ("Sylkhuis" or "Assistant Warden Sylkhuis") assists Warden Weber in administering the SDSP.  On information and belief, in 2004 and 2005, Sylkhuis was the interim warden of SDSP while Sec. Reich was on leave to the military and Warden Weber temporarily assumed the position of Secretary of Corrections during Sec. Reisch's absence.

12.   Defendant Manish Sheth ("Sheth" or "Dr. Sheth") is a medical doctor and a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

13.   Defendant Ulises Pesce ("Pesce" or "Dr. Pesce") is a medical doctor and a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to Sam while Mr. Boston has been an inmate.  His treatment of Sam came especially during a time of an inexplicable series of poor judgments by doctors and staff.  He is the subject of at least one administrative remedy that Sam has filed.

14.   Defendant Justin Falon ("Falon") is a mental health counselor who has counseled Mr. Boston for mental health problems while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or both of his administrative remedies noted below.

3

15.    Defendant E.R. Regier ("Regier" or "Dr. Regier") is a medical doctor and on information on belief is the director of medical services at SDSP, who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

16.    Defendant Don Gilchrist, ("Gilchrist" or "Dr. Gilchrist") is a medical doctor, and on information and belief, a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

17.    Defendant John Erpenbach ("Erpenbach") is a certified nurse practitioner in mental health who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him, which contributed to Mr. Boston's eventual mental downward spiral.  He is the subject of at least one administrative remedy that Sam has filed.

18.    Defendant Luther Hegland ("Hegland" or "Dr. Hegland") is a medical doctor and a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

19.    Defendant John Durso ("Durso" or "Dr. Durso") is a medical doctor and a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

20.    Defendant Don Baum ("Baum" or "Dr. Baum") is, on information and belief, a medical doctor treated Mr. Boston for mental health problems and oversees other staff who treated Mr. Boston while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.  On information and belief, Defendant Baum can determine Sam's placement within SDSP.

21.    Defendant Donna Reit ("Reit") is a counselor who has counseled Mr. Boston for mental health and psychiatric problems while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.  In December 2004, she was aware of Sam's mental health issues but refused to take action to assist him.

22.    Defendant Robert Strayhan ("Strayhan" or "Dr. Strayhan") is a medical doctor and a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.  On information and belief, the Plaintiff believes Defendant Strayhan worked for a temporary medical service, namely, Defendant John Doe Corporation, that provided psychiatric care to SDSP from about June and July of 2004. Defendant Strayhan made a significant medication change on July 15, 2004, one day prior to Mr. Boston's transportation across South Dakota to Rapid City for his state habeas corpus hearing.  This caused Mr. Boston to go three to four days without medication.

23.    Defendant Craig Kleinsasser ("Kleinsasser") is a mental health worker who has counseled Mr. Boston for mental health problems while Mr. Boston has been an inmate, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

24.    Defendant Manjot Leafgreen ("Leafgreen" or "Dr. Leafgreen") is a medical doctor and a psychiatrist who has treated Mr. Boston for mental health and psychiatric problems and prescribed medications to him while Mr. Boston has been an inmate, in particular during the times Mr. Boston was forced to spend the entire 2003 Thanksgiving holiday weekend in a "hard cell" due to no fault of Mr. Boston's and through the period of time where Mr. Boston had decompensated to the point of physical and mental deterioration in Unit A Section 1 in 2004.

25.    Defendant Alan Brevick ("Brevick" or "Dr. Brevick") is, on information and belief, is a psychiatrist who saw Mr. Boston on September 21, 2004, deferred any medication change for Sam, even though Sam had dark circles under his eyes and Dr. Brevick could not figure out a treatment plan.  He told Mr. Boston, "I'm here today just to put out big fires.  You won't die.  I'm a temp."  At this time, Mr. Boston was in Unit A Section 1.

26.    Defendant Andy Voss ("Voss") is a mental health counselor who counseled Mr. Boston in September 2007 approximately ten days prior to Mr. Boston being referred for a suicide watch.

27.    Defendant Mark Style ("Style" or "Dr. Style") is, on information and belief, a medical doctor and a psychiatrist who was a temporary psychiatrist employed by SDSP or Defendant John Doe Corporation who Mr. Boston requested to see on or about December 18, 2004 and was refused.  Sam was in a decompensation state due to the treatment he had received in Unit A Section 1.  Sam was then abruptly transferred out of mental health Unit A Section 1 and the special needs program provided for

inmates with mental disabilities for no apparent reason. This was further complicated by the continuing breakdowns in the mental health system at the prison.

28.    Defendant John Doe Corporation ("John Doe Corporation") is, on information and belief, a temporary medical health care provider to prisons such as SDSP. On information and belief, John Doe Corporation hired and supervised Defendants Strayhan and Style and perhaps others in conjunction with Defendants South Dakota, SDDOC, Reich, Weber, and Sylkhuis concerning Defendant Strayhan's and Style's care of Mr. Boston. At this time, the Plaintiff has not been able to ascertain from the State of South Dakota what company South Dakota and or SDDOC hired on a temporary basis to provide these services. Neither the State Auditor's Office nor the SDDOC has been forthcoming with this information despite attempts by Sam's attorneys to ascertain this information.

29.    On information and belief except as noted below, all of the Defendants are American citizens, in particular during the times Mr. Boston has filed for one or all of his administrative remedies noted below.

30.    On information and belief, the Plaintiff believes that Dr. Pesce is an Argentine national but does not know the nationalities of Dr. Sheth or Dr. Leafgreen.

## Defendants to 42 U.S.C. § 12131 Action ("ADA Defendants")

31.    The State of South Dakota ("South Dakota" or "State"), is a sovereign state of the United States of America and administers SDSP via its SDDOC. It is a "public entity" as defined under 42 USC § 12131(1)(A) and (B) *et seq.*

32.    The South Dakota Department of Corrections is an executive agency of the South Dakota charged with administering the SDSP with and the care and treatment of inmates such as the Plaintiff. It is a "public entity" as defined under 42 USC § 12131(1)(A) and (B) *et seq.*

## FACTS COMMON TO ALL COUNTS

33.    Since his incarceration at SDSP, the Plaintiff has had numerous, differing diagnosis of his mental health and psychiatric problems.

34.    Based on records obtained from SDSP and SDDOC, the following diagnoses were made of Mr. Boston by the Defendants. These diagnoses are listed below and based on an analysis of Exhibit A, a true and correct copy of key mental health and psychiatric records kept by the SDDOC on Mr. Boston, attached hereto and incorporated herein:

## What Is Wrong With Sam Boston?

### Sam Imprisoned for DUI

A. 4/18/2001—Generalized anxiety disorder; history of panic disorder with agoraphobia; alcohol abuse;

B. 4/20/2001—Adjustment disorder with mixed anxiety and depressed mood (tentative)

C. 7/12/2001—No psychotic symptoms, anxiety under control, pleasant individual

### Sam Imprisoned for Felony Murder

D. 5/13/2002—Depressive disorder;

E. 6/27/2002—Depressive symptoms, stable;

F. 8/22/2002—Depression and suspiciousness;

G. 9/12/2002—Depressive symptoms and suspiciousness;

H. 10/31/2002—Depressive symptoms, stable;

I. 12/12/2002—Depressive symptoms, stable;

J. 2/21/2003—History of panic disorder with agoraphobia, alcohol abuse, depression not otherwise specified;

K. 3/28/2003-History of panic disorder with agoraphobia, alcohol abuse, depression not otherwise specified;

L. 6/20/2003—Panic disorder with agoraphobia; alcohol abuse;

M. 8/29/2003—Panic disorder with agoraphobia; alcohol abuse;

N. 11/14/2003—Panic disorder with agoraphobia; alcohol abuse

O. 11/24/2003—Emergency medication change per Erpenbach made over a cell phone without examination or consultation with Mr. Boston, resulting in

Mr. Boston being hospitalized that evening due to severe shock from a complete nervous breakdown;

P. 11/24/2003—Sam transported to emergency room at Avera McKennan that evening. Sam was seen by a Dr. James Brown at Avera. Dr. Brown stated that "there were some oversights with his (Sam's) medication or differing people were managing, and at one point he was supposed to get doxepin 50 mg at bed, but it was never given." Dr. James made the following diagnosis—anxiety reaction, possibly related to medication change, possible benzodiazepines withdrawal, and possible allergic reaction to nortiptylilne. Dr. Brown wanted Sam to obtain a mental health follow-up but was blatantly ignored by the Defendants;

Q. 11/26/2004—Emergency medication change per Erpenbach made over a cell phone without examination or consultation with Mr. Boston that resulted in Mr. Boston's physical and mental appearance to be deemed by Correctional Officer Cory Bentliff to be unsafe and unfit to stay in general population, resulting in Sam's first placement in a Unit A Section 1 (mental health) hard cell the entire Thanksgiving 2003 weekend, November 26, 2003 to December 1, 2003;

R. 12/8/2003—Panic disorder, PTSD, alcohol abuse;

S. 1/9/2004—Panic disorder, PTSD, alcohol abuse;

T. 3/26/2004—Panic disorder, PTSD, alcohol abuse;

U. 7/15/2004—Anxiety disorder NOS with features suggestive of PTSD;

V. 9/21/2004—Panic disorder, PTSD, Alcohol abuse/dependence, bi-polar disorder NOS, provisional, personality disorder NOS;

W. 12/4/2004—Medication change per Dr. Regier without examination or consultation with Mr. Boston;

X. 1/4/2005—Panic disorder, PTSD, History of alcohol abuse; bi-polar disorder, provisional, personality disorder NOS;

Y. 3/29/2005—PTSD, currently stable, dysthymia, bi-polar disorder NOS by history currently stable, personality disorder.

Z. 9/1/2005—PTSD, stable, dysthymia, personality disorder NOS;

AA.    10/25/2005—Bi-polar NOS, personality disorder NOS with mixed traits, panic disorder

BB.    12/27/2005—PTSD, stable, dysthymia, personality disorder NOS;

CC.    3/7/2006—Panic disorder; depression NOS, PTSD, dysthymia, personality disorder NOS;

DD.    5/9/2006—Panic disorder, PTSD, alcohol abuse in remission, personality disorder NOS;

EE.    8/8/2006—Panic disorder, PTSD, alcohol abuse in remission, personality disorder;

FF.    10/11/2006—Panic disorder, PTSD, depression, bi-polar;

GG.    10/24/2006—History of panic disorder, PTSD, alcohol dependency or abuse, history of personality disorder with strong anti-social features;

HH.    1/16/2007—History of panic disorder, PTSD, alcohol dependence in remission, cluster B personality traits;

II.    4/30/2007—Bi-polar disorder, most recently mixed;

JJ.    6/11/2007—Bi-polar disorder, improving;

KK.    9/14/2007—Bi-polar disorder versus depressive disorder NOS, PTSD, alcohol dependence in remission, history of panic attack;

35.    Associated with these differing diagnoses, Sam received a wide variety of psychotropic and other medications from 2001 to the present, supposedly to alleviate, cure, manage, or otherwise improve Mr. Boston's mental health and psychiatric state.  Mr. Boston has been on Serzone then off; on Trazodone then off; on Bupropion then off; on Amitriptyline then off; on Risperdal then off; on Buspar then off.  On Nortriptyline then off; on Doxepin then off; on Zyprexa then off; on Wellbutrin then off; on Zoloft then off; on Ativan then off; on Celexa then off; on Paxil then off; on Depakote then off; on Visteral then off.   Sam is currently on Bupropion, Clonapin, and Rimron.  *See* Exhibit A.

36.    Along with these differing diagnoses and variety of medications that he was on and off, he also saw a wide variety of mental health care and medical providers, primarily the named Defendants except for Secretary Reich, Warden Weber, and Interim Warden Sylkhuis.  *See* Exhibit A.

37.   Despite all the differing diagnoses by all the differing mental health care and medical providers and the variety of medications that Mr. Boston has received from 2001 to the present, Mr. Boston continues to suffer from mental illness.

38.   Sam's mental illness to this day has not been properly diagnosed or treated to the point where he can function normally.

39.   Because Sam's mental illness issues have not been properly diagnosed or treated, he continues to suffer from anxiety, delusions, weight gain, lack of sleep, and a variety of other mental and physical problems.  The denial and lack of concern by the Defendants relating to Mr. Boston's mental health is disheartening and inexcusable.  Such treatment of Sam by the Defendants rises to a level of cruel, inhuman, and degrading treatment.

## Photographs of Sam

40.   On or about September 15, 2004, While housed in Unit A, Section 1 of SDSP, Sam was able to get SDSP staff to take a series of photos of his deteriorating physical and mental state created by the unprofessional, inexcusable series of events that includes sudden transfers, medication changes, classifications (i.e., general population, special needs, critical condition back to low priority) with no apparent rhyme or reason, and no records or paperwork to justify such changes.  The people Mr. Boston begged for relief and understanding repeatedly defended the indefensible, which is the fact that Sam was treated as less than a human should be treated, even a felon.  His face is bloated, his eyes are red, and he has bags under his eyes.  *See* Exhibit B, true and correct copies of photographs of Sam Boston taken on or about September 15, 2004 while Sam was incarcerated, attached hereto and incorporated herein and below.



## The Holding Pattern

41.     Beginning approximately July 27, 2004 and continuing through approximately September 22, 2004, Sam was essentially placed in Unit A Section 1 by staff into a unique status called a "holding pattern" due to the fact Sam was now deemed "low priority." Sam would not be allowed to see a psychiatrist (even though there were temporary psychiatrists available and treating other inmates) until Dr. Hegland was permanently employed as the psychiatrist at SDSP.

42.     After Dr. Pesce left SDSP as permanent psychiatrist and before Dr. Hegland was hired as his replacement as permanent psychiatrist on or about September 21, 2004, SDSP was relying on a temporary service (Defendant John Doe Corporation) to provide psychiatric care to Mr. Boston and other inmates with mental health issues.

43.     Also on September 21, 2004, Dr. Hegland made a significant medication change for Mr. Boston. The next day, September 22, 2004, for no apparent rhyme or reason, SDSP mental health abruptly transferred Sam to general population and a three-man cell with no adjustment time. This contradicted follow-up orders given by Dr. Hegland for Unit A Section 1 guards to monitor Sam's sleep. The same day, unbelievably, Mr. Boston was also removed from the "special needs program" to deal with life in West Hall after spending over 71 days in total isolation to include single cell, hard cell, always handcuffed during transportation, etc., i.e., maximum security conditions.

## Sam's Thanksgiving 2003 Mental Health Debacle

44.     The photographs shown above were seen by Correctional Officer ("CO") Bentliff, who was the officer on duty November 27, 2003 when he made the judgment call to remove Sam from general population for Sam's own safety. Sam was placed in a hard cell over the 2003 Thanksgiving weekend as noted above. CO Bentliff told Sam the signs and symptoms he exhibited in the photos were the same signs and symptoms that he noticed while on duty in the Thanksgiving 2003 mental health disaster. Sam was placed on emergency mental health status and a hard cell at this time.

45.     From on or about November 18, 2003 until December 9, 2003, three medical providers (Defendants Erpenbach and Pesce and non-party Dr. James Brown) had ordered four changes in Sam's psychiatric medications. On only two of these four changes was Sam actually seen or an inquiry made as to how he was feeling.

46.     Prior to Sam being taken to the emergency room as described above on November 24, 2003, Defendant Erpenbach had prescribed a medication order for Sam

over the cell phone.  Mr. Boston believes this shows indifferent neglect concerning his mental health treatment.

47.    On November 17, 2003, Sam's counselor, Mrs. Duffy, referred him to health services because "he looked drugged out on narcotics or pot" as a result of Dr. Pesce's irresponsible and careless medication changes.  Dr. Pesce was planning to go on vacation to New York and Argentina on approximately November 22, 2003.  J.P. at health services put in an emergency referral for Sam to see Dr. Pesce before November 21, 2003, the last day Dr. Pesce would be available.

48.    Also on November 17, 2003, SDSP nurse Janet P. (last name unknown) actually pulled Dr. Pesce's psychiatric file on Sam and stated, "It looks like he (Dr. Pesce) pulled another Pesce (made a mistake)."

49.    On November 19, 2003, Falon removed the emergency referral from Dr. Pesce's inbox and instead attempted to counsel Mr. Boston. This callous and unprofessional decision by Falon resulted in Sam's missing his last chance to correct a horrible mistake made by Dr. Pesce before his two week absence from SDSP.

### Follow-up to the Thanksgiving 2003 Debacle

50.    Following the Thanksgiving 2003 debacle, counselor Seville Olson made a referral to SDSP's special security unit to perform interviews and investigate how Sam's condition at that time was allowed to deteriorate so badly.

51.    In January 2004, Sam was placed into the "special needs" program due to his decompensation from the events that transpired over Thanksgiving 2003.

52.    On July 13, 2004, Sam was put in Unit A Section 1 (mental health) due to his mental condition falling apart.

53.    From May 2001 when Sam first entered the prison to October 2004, on information and belief, Sam only had three minor write ups for rules and regulations infractions.

54.    From October 2004 to the present, Sam has had, on information and belief, approximately 70 write-ups, including major write-ups.

55.    On July 13, 2004, the mental health treatment team transferred Sam to Unit A Section 1 on reports that Sam was "falling apart" and that his status was "critical."

56.     The treatment that Mr. Boston was subject to in Unit A Section one during his 71 days there from July to September 2004 was staggering to him. In Unit A Section 1, Sam was forced into solitary confinement. The terrible impact of his stay in Unit A on Sam as shown from his photos, above, is evident. Sam believes that his stay in Unit A Section 1 and the Defendants' actions exacerbated his mental health issues, causing him to act out.

## The Hard Cell

57.     Stemming from this disregard for Sam's mental health and general welfare, Sam, for the first time had been described or treated as anything other than a model inmate and a neat, polite person. From approximately November 27, 2003 through December 1, 2003, Sam was placed in Unit A in a "hard cell" because of his psychological downward spiral. He was not placed in the hard cell for disciplinary reasons.

58.     A hard cell is devoid of furnishings and consists of a cement slab in the center of the floor. It is a very small, claustrophobic room, with a medieval-looking slab in the shape of a large "T" in the center of the cell. There are two round metal rings that protrude from the ends of the T to restrain the inmate's hands and two pieces of steel to shackle the inmate's feet to at the bottom of the T. No clothes are provided, sometimes a suicide suit is provided if available or necessary. The only humane consideration given to someone placed in the hard cell and "four pointed" is the ability of the inmate to raise his head off the concrete slab ten to twelve inches in order to breathe, swallow, or prevent death by natural causes due to extreme conditions.

60.     One former guard at SDSP, Matt Muchow, now a reporter for the Sioux Falls Argus Leader, describes his first experience in Unit A as follows:

> I would work most of those four years on the Death Row and disciplinary unit, known as Unit A in the Jameson Annex.

> I recall smelling and hearing the inmates before I could see them the first time I stepped onto Unit A. I stood at the large metal door, waiting for it to clank and slide open. I could hear the inmates yelling to one another, pounding, some singing, and just the general noise of so many men living in close quarters. There also was the smell: a mixture of body odor, unflushed toilets, stale air and the lingering stink of pepper spray. The pepper spray was used on the unit to quell disturbances and unruly inmates and protect officers.

> If someone had sprayed the stuff before your shift, sometimes hours later the spray still would be strong enough to make your eyes water and nose run.

Sometimes I thought the stuff had soaked permanently into the concrete and steel.

The unit I worked housed those inmates who had broken prison rules and were sent to "The Hole" for varying lengths of time. It housed mental health inmates, inmates on protective custody, inmates too dangerous for one reason or another so that they had to be separated from the general prison population. It also housed the condemned: three grown men, and two young enough to be my younger brothers.

*See* Exhibit C, a true and correct copy of Matthew Gruchow's "Voices" column in the July 8, 2007 Sioux Falls Argus Leader, attached hereto and incorporated herein.

61.     The Thanksgiving 2003 episode was not the first time Mr. Boston had been placed in a hard cell.

62.     During Mr. Boston's placements in a hard cell, he was shackled naked on his back, with his arms chained spread eagle to rings and his feet similarly fastened. At this particular time, his first incarceration in a hard cell, he stayed in this position from early morning of August 14, 2001 to the early morning of August 15, 2001. He was forced to defecate and urinate on himself while in this position.  This was the most shocking experience of Sam's life.  This was the first time Sam was placed in a hard cell.

63.     At first glance of the hard cell, Sam could not remember anything this archaic in his life, including four years as a paratrooper in special operations in the United States Army, from 1985-89, with missions involving the former Soviet Union and Warsaw Pact nations.

64.     On a progress note from Dr. Pesce on July 12, 2001, approximately one month prior to Sam being placed in the hard cell as noted above, the note stated, "Mr. Boston is doing very well. He improved dramatically after I made adjustments in the medication. His mental status shows a pleasant individual who is ready to get out of the penitentiary. He is stable on the current medications. He shows no psychotic symptoms." Mr. Boston's placement in Unit A Section 1 in a hard cell obviously had nothing to do with his mental state. It was transportation purposes only.

## Sam's Grievances and Administrative Remedies

65.     As Sam's mental health issues have continued, the lack of proper diagnosis and treatment have caused Sam to "act out" or otherwise receive discipline for his actions. *See* above. Had his mental health issues been properly diagnosed and treated, Mr. Boston would likely not incur these disciplinary problems, saving himself

and SDSP staff time and trouble.

66.     Sam also believes that his housing situation at SDSP has been just as big of a problem as his other charges contained in this Complaint. In fact, Sam believes that some of these housing issues have sometimes been worse, as they have exacerbated Sam's mental condition. The lack of attention or concern has been problematic for Sam, guards, unit staff, and high-ranking administrators, including associate and assistant wardens.

67.     Many times Sam has asked to be transferred to less stressful and lower profile housing assignments. These requests have been ignored or denied. Further, Sam was never given a "straight answer" as to who at SDSP had the authority to make decisions concerning Sam's housing, employment, and other issues.

68.     Mr. Boston made a number of grievances concerning his mental health that he took through SDSP's administrative process, *infra*.

69.     Mr. Boston asserts continuous and ongoing deliberate indifference of his mental and psychological issues since his incarceration in 2001. As noted in Paragraph 20 above, Mr. Boston has been receiving ineffective and indifferent treatment since 2001 and particularly since December 20, 2004 and ongoing.

70.     The Defendants were put on actual or constructive notice by Mr. Boston's *habeas corpus* attorney, Kenneth Dewell, via letter, on or about July 23, 2004, that Mr. Boston's mental wellbeing was disintegrating. *See* Exhibit D, a true and correct copy of letter to Assistant Warden Sylkhuis of July 23, 2004, attached hereto and incorporated herein.

71.     Again, on or about August 17, 2005, Nancy Boston, the Plaintiff's mother, sent Defendant Weber a letter worried that Sam's condition not be allowed to deteriorate again and that "proper care/attention be given to him." *See* Exhibit E, a true and correction copy of letter to Warden Weber of August 17, 2005, attached hereto and incorporated herein.

72.     In particular, Mr. Boston has taken at least two grievances concerning his mental health and psychiatric treatment to their administrative conclusion as required by the Prison Reform Act.

73.     On December 20, 2004, the Plaintiff made a request for administrative remedy—an Informal Resolution Request ("IRR")--at SDSP concerning his medication and treatment for his mental health issues. *See* Exhibit F, a true and correct copy of 2004 Administrative Remedy Records, attached hereto and incorporated herein.

74.    In this December 20, 2004 request, Mr. Boston noted the treatment or lack of treatment he had received to that point as well as more recent issues concerning his treatment. In December 2004, he noted that Defendant Reit told him, "Boston—you know there's no psychiatrist, you're not gonna die from med change—you'd see a doctor when and if one becomes available." At this point, it had been three months since Sam had seen a psychiatrist to monitor the change in his condition. There were temporary psychiatrists working at SDSP at this time. *See* Exhibit F.

75.    This request for an administrative remedy was disposed of on December 27, 2004 was denied, but with the admission that the Defendants had not provided for a psychiatrist: "When weekly psychiatry appointments resume, we will schedule." *See* Exhibit F.

76.    On or about January 9, 2006 and January 16, 2006, Sam had filed IRRs concerning problems with the movement of his property while he was showering and that he had been denied access to his records, particularly concerning his mental health treatment and diagnosis from October 1, 2004 through December 31, 2004 and again from July 14 2004 to September 22, 2004, as well as allegations that Dr. Pesce had "screwed up" his medications, requiring SDSP's Warden and special security to get involved. See Exhibit G, true and correct copies of 2006 Administrative Remedies and Informational, attached herein and incorporated herein.

77.    Just prior to filing these IRRs, SDSP wrote an information report on Sam concerning a January 5, 2006 incident concerning Sam's behavior. *See* Exhibit G. The report noted that "I noticed him (Sam) talking to himself. Swearing at the weights he was lifting and walking around showing nervous ticks such as opening his mouth and sticking out his neck, waving his hands in front of his face and repitional (sic) motions."

78.    On or about January 24, 2006 these requests for Administrative Remedy appear to have been denied by Warden Weber. *See* Exhibit G.

79.    On or about June 20, 2007, Mr. Boston filed another IRR concerning his mental health and psychiatric care. *See* Exhibit H, a true and correct copy of 2007 Administrative Remedy Records, attached hereto and incorporated herein.

80.    In this IRR, Sam complained of his Depakote prescription making him sleepy. Sam also complained of having to take Paxil, a drug that the alleged victim of his felony murder was taking at the time of his death. Sam also requested to be taken off the Paxil because of this psychological stress and the drug's side effects. *See* Exhibit H.

81.    Instead of taking him off Depakote and Paxil, once again, the abusive nature of Sam's treatment resulted instead in an increase of Sam's Depakote and Paxil. *See* Exhibit G.

82.    On or about June 25, 2007, Sam again filed an IRR, complaining about his medications. Mr. Boston noted, "I've worked with Justin Fallon for over 4 years and Dr. Sheth for over 2 years. The last time my meds were correct was before November 2003 when Dr. Pesce was my psychiatrist. . . ." *See* Exhibit H.

83.    On or about July 5, 2007, Warden Weber responded and denied the Plaintiff's request for Administrative Remedy concerning his medications. *See* Exhibit H.

84.    On November 2, 2007, Sam filed two related IRRs. One filed October 12, 2007 concerned Sam's request for mental health care and medications. *See* Exhibit G. The second, filed October 17, 2007 and October 29, 2007 concerned Sam requesting contact with a psychiatrist and a request for better mental health care. *See* Exhibit H.

85.    On or about November 2, 2007, Defendant Sylkhuis denied these Administrative Remedies. *See* Exhibit H.

## Some Final Thoughts

86.    On information and belief, the Plaintiff believes the deliberately indifferent mental health and psychiatric diagnoses and treatment he has received, particularly the ability of non-physician medical staff to overrule medical staff on the prescribing or unprescribing of medication is a pattern of behavior throughout the SDDOC. See Exhibit I, a true and correct copy of Memorandum of August 6, 2006 from Judge Charles Kornmann to Attorney Neil Fulton and *pro se* plaintiff Jamie L. Lambertz Brinkman in *Lambertz Brinkman v. Reisch, et al.,* U.S. District Court, District of South Dakota, 3:06-cv-03008-CBK, attached hereto and incorporated herein.

87.    Mr. Boston understands that he is paying his debt to society with his conviction and a serving a life sentence. He accepts these facts. However, he fears a life of continual abuse and mental torture due to the Defendants' ineptness and desire to maintain the status quo at SDSP. He does not think that this should come at the expense of a man's sanity.

## FIRST CLAIM
### (42 U.S.C. 1983 Civil Rights Violation)

88.    Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 1 through 87 herein.

89.    The Defendants' failure to properly diagnose and treat Mr. Boston's mental and psychiatric issues was deliberately indifferent and violated the Plaintiff's rights granted and preserved by the Fifth, Eighth, Ninth, and Fourteenth Amendments to the Constitution of the United States.

90.    The Defendants' actions were committed under color of law or pursuant to policies, customs, practices, rules, regulations, ordinances, statutes or other promulgations of the State of South Dakota, Department of Corrections, and SDSP.

91.    The Plaintiff has no adequate and sufficient remedy at law with which to address the wrongs alleged herein and will continue to suffer irreparable injury from the conduct of Defendants unless he is granted the equitable and legal relief prayed for herein.

92.    The Defendants' deliberate indifference in its mental health care of Mr. Boston constitutes cruel and unusual punishment.

93.    The problems with Mr. Boston's mental health are ongoing.  When Mr. Boston attempts to obtain help for his mental issues, he is punished, directly or indirectly, knowingly or unknowingly, by SDSP.

94.    As a direct result and proximate result of the above-described actions and omissions of Defendants, Defendant has suffered general damages.

95.    That the allegations contained herein violate 42 USC § 1983.

**SECOND CLAIM**
**(ADA Violation)**

96.    Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 1 through 90.

97.    On or about August 26, 2005, the Social Security Administration ("SSA") found that Mr. Boston was mentally disabled due to mental illness in a "Fully Favorable" decision—and that he had been since October 12, 1997.  *See* Exhibit J, a true and correct copy of Mr. Boston's Social Security Disability Award Decision, attached hereto and incorporated herein.

98.    The SSA administrative law judge found that Mr. Boston's impairments were "severe" under the Social Security Act and included: bipolar disorder or recurrent

major depressive episodes with intermittent psychotic symptoms; panic disorder with agoraphobia; a long history of polysubstance abuse; and a possible schizoaffective disorder. *See* Exhibit J, ¶ 2, p. 5.

99.     Further, the SSA administrative law judge found that Mr. Boston has the following mental limitations: moderate restriction on activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation. *See* Exhibit J, p. 3.

100.    Sam is mentally disabled and incarcerated in the SDSP. He receives services provided by the SDSP and participates in programs provided by the SDSP as part of his incarceration. He meets the essential eligibility requirements to receive those services and programs pursuant to 42 U.S.C. 12131(2).

101.    Because of Mr. Boston's mental disability, he is not able to fully participate in or take full advantage of those services and programs. Because of his mental disability and the ADA Defendant's failure to make reasonable accommodations for it, he is unable to live in the general population, unable to work for wages in the prison, unable to take advantage of educational and rehabilitation programs offered by the prison, and unable to recreate and socialize with other inmates and staff in the prison.

102.    Because of the ADA Defendant's failure to make reasonable accommodation for Mr. Boston's mental disability, he has been excluded from participation in various programs at SDSP and denied the benefit of services, programs and activities that SDSP provides non-disabled inmates, pursuant to 42 U.S.C. § 12132.

WHEREFORE, Plaintiffs pray for the following relief:

A.      That the Court declares the 1983 Defendants' failure to adequately diagnose and treat the Plaintiff for his mental health conditions violates Mr. Boston's Eighth and Fourteenth Amendment Rights.

B.      That the Court order 1983 Defendants Reich and Weber to hire an independent psychiatrist and an independent psychologist or clinical social worker to examine, treat, and counsel Mr. Boston concerning his mental health issues until Mr. Boston has been properly diagnosed and treated for his mental illness.

C.      That the Court awards the Plaintiff compensatory damages for one

million dollars from the ADA and 1983 Defendants.

D.   That the Court awards the Plaintiff punitive/exemplary/special damages for ten million dollars from the ADA and 1983 Defendants.

E.   That the Court awards the Plaintiff his costs and attorneys fees to bring this action.

F.   That the Court declares that the ADA Defendant has violated Mr. Boston's rights as a disabled person under the ADA.

G.   That the Court orders the ADA Defendant to make reasonable accommodations to the Plaintiff for his mental disability that will allow him to participate as fully as possible in the programs, services, and activities available to non-disabled inmates at SDSP.

H.   That the Court finds that the ADA and 1983 Defendants are jointly and severally liable for said damages in C., D, and E. above.

I.   That the Court declare the use of a hard cell on mentally ill inmates such as Mr. Boston as cruel and unusual punishment in violation of the 8th and 15th Amendments (and other Constitutional rights) to the United States Constitution.

J.   That the Court enjoins the Defendants' or anyone under their authority from subjecting Mr. Boston to a hard cell during the duration of his incarceration at the SDSP or any other SDDOC facility.

K.   For such other and further relief as this Court deems just and appropriate.

Dated this __5__ day of __December__ , 2007.


BY: _Samuel Boston_

Samuel Boston
South Dakota State Penitentiary
Inmate # 39300
PO Box 5911
Sioux Falls, SD  57117-5911

## DEMAND FOR PUNITIVE DAMAGES

Plaintiffs note their intention to seek punitive, exemplary, or other special damages as allowed by state or federal law.

## NOTICE OF APPEARANCE

Todd D. Epp and Rachel A. Riphagen of Galland Law Firm, P.C., 317 N. Main Ave., Sioux Falls, SD  57104, (o) 605.334.0446, (f) 605.334.5388 (email) tepp@gallandlegal.com and rriphagen@gallandlegal.com, hereby note theirtheir appearanceshis matter.

Todd D. Epp
SBSD # 2700

Rachel A. Riphagen
SDSB #3788

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the Plaintiff in the above action, that he has read the above Complaint and that the information contained in the Complaint is true and correct.  28 USC § 1746; 18 USC § 1621.

Executed at the South Dakota State Penitentiary in Sioux Falls, SD on Dec. 5, 2007.

*Samuel Boston*

Samuel Boston
(Prisoner's original signature)